**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SHARON MEIER,                    )
                                 )    CASE NO.    5:07-cv-3308
           Plaintiff,            )
                                 )
     v.                          )    MAGISTRATE JUDGE VECCHIARELLI
                                 )
MICHAEL J. ASTRUE,               )
   Commissioner of Social Security,  )    **MEMORANDUM OF OPINION**
                                 )
           Defendant.            )

         This case is before the magistrate judge by the consent of the parties.  Plaintiff,

Sharon Meier ("Meier"), challenges the final decision of the Commissioner of Social

Security, Michael J. Astrue ("Commissioner"), denying Meier's application for a period of

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons set forth

below, the court vacates the opinion of the Commissioner and remands the case for further

proceedings consistent with this opinion.

                              I.  Procedural History

         Meier filed an application for DIB on September 2, 2003, alleging disability as of

August 15, 2003[1] due to osteoarthritis, fibromyalgia, sensitivity to cold, depression, acid

_____

         [1]  Meier originally claimed August 1, 2003 as her onset date.  This was changed by
amendment on the day she filed her application.

reflux, and sleep apnea. Her application was denied initially and upon reconsideration. Meier timely requested an administrative hearing.

Administrative Law Judge John L. Shailer ("ALJ") held a hearing via teleconference from Columbus, Ohio on October 26, 2006. Meier, represented by counsel, testified on her own behalf. Jeffrey D. Madden, Ph.D., testified as a medical expert ("ME"), and Carl W. Hartung testified as a vocational expert ("VE"). The ALJ issued a decision on April 27, 2007 in which he determined that Meier is not disabled. Meier requested a review of the ALJ's decision by the Appeals Council. When the Appeals Council declined further review on September 27, 2007, the ALJ's decision became the final decision of the Commissioner.

Meier filed an appeal to this court on October 25, 2007. Meier alleges that the ALJ erred by (1) failing to give appropriate weight to the opinion of Meier's treating physician and (2) concluding that Meier is not disabled by pain. The Commissioner denies that the ALJ erred.

## II. Evidence

A. *Personal and Vocational Evidence*

Meier was born on April 20, 1956 and was 50 years old at the time of her hearing. She is a high school graduate and has received vocational training as a certified dietary manager, but no longer has current certification. She has past relevant work as a kitchen helper, dietary aid, cook's helper, server/counter helper, cook, cafeteria manager, and dietary manager.

B. *Medical Evidence*

From April of 1999 through July of 2000, Meier was treated at the Center for Sleep Disorders for snoring and sleep apnea. Tr. at 202-09. Her sleep apnea was brought under

2

control with medication and an assistive device.

George Q. Seese, III, D.O., examined Meier on January 21, 2000.  Tr. at 281-82. He reported Meier's blood pressure as 120/70 and her weight as 271 pounds.  Meier complained of chest pain, lightheadedness, dizziness, and heart arrhythmia.  Examination revealed regular heartbeat with frequent ectopics and peripheral pulses of 2+/4+ bilaterally. Dr. Reese diagnosed palpitations probably associated with benign ventricular arrhythmia and sleep apnea.  He prescribed Toprol and suggested that Meier increase her potassium.

Meier had surgery on both feet in January 2000 to remove bone spurs from her heels.  Tr. at 210-15.  The surgery and recovery were successful.

On March 13, 2002, Meier's thumbs were x-rayed at the request of her family physician, Jeffrey W. Schultz, M.D.,  in response to Meier's complaints of pain.  Tr. at 232. The x-ray of the right thumb was unremarkable.  The x-ray of the left thumb revealed moderate degenerative changes with sclerosis and spurring of the first metacarpal joint.

Dr. Seese examined Meier again on May 16, 2000, December 21, 2000, May 22, 2001, November 20, 2001, May 17, 2002, and November 15, 2002.  Tr. at 279-80, 277-78, 275, 274, 273, and 276.  Examinations generally revealed a regular heartbeat and normal sounds, high blood pressure, and weight ranging from 240 pounds to 270 pounds. Diagnoses included hypertension, palpitations, obstructive sleep apnea, mitral valve prolapse.  An x-ray of Meier's right knee on May 23, 2003 revealed no abnormalities. Examinations on May 23, 2003 and November 21, 2003 by Dr. Seese also revealed nothing unusual.

On November 18, 2003, Dr. Schultz completed a report of his treatment of Meier for the Bureau of Disability Determination ("Bureau").  Tr. at 247-49.  He reported that Meier's

3

current diagnoses included hypertension, constipation, arrhythmia, depression, dysphagia, fatigue, fibromyalgia, gastroesophageal reflux disease, osteoarthritis, and a sliding hiatal hernia.  Meier's dysphagia had appeared only in the past two months and was improving.  The osteoarthritis was described as debilitating and as limiting where she can go and how long she can walk.  He described Meier as having crepitations in both knees and hips and poor gait, as of October 30, 2001.  According to Dr. Schultz, these latter symptoms were worsening.  He also described Meier as having fibromyalgic pain and trigger points along her spine and in the muscles of the legs, conditions which had been worsening over the past two years.  He noted that Meier had consulted a rheumatologist, had undergone knee surgery, and that physical therapy had helped her maintain activities of daily living.  In describing Meier's ability to shop, Dr. Schultz wrote:

> She really does not go out much.  She does not like to walk in shopping malls, secondary to pain.  Her husband drops her off if she does got [sic] and get the scooter cart and then after a half an hour of sitting, she needs to go and get out of there, secondary to pain in her hips.

Tr. at 248.    Her then-current medications included Aciphex,[2] Atenolol,[3] Diovan,[4] a Duragesic patch,[5] Neurontin,[6] Percocet[7] (one to two times per day at 5/325, three to four

_____

[2]  For gastroesophageal reflux.

[3]  For high blood pressure and cardiovascular disease.

[4]  For high blood pressure.

[5]  The Duragesic patch releases fentanyl transdermally.  Fentanyl is an opiod 80 times more potent than morphine and is listed as a Schedule II drug.  *See* www.usdoj.gov/dea/concern/fentanyl.html.  Its biological effects are indistinguishable from those of heroin.  *Id.*  The Duragesic patch is indicated *only* for persistent moderate to severe chronic pain that cannot be managed by other means.  *See* www.fda.gov/cder/foi/label/2005/19813s039lbl.pdf, p. 1.  Its side effects include abdominal pain, headache, fatigue, back pain, fever, influenza-like symptoms, rigors, nausea,

times per week), Serzone,[8] and Vioxx.[9]

When asked to describe any limitations and impairments imposed on Meier's ability

to perform sustained work, Dr. Schultz wrote as follows:

> Sit is okay.  It does hurt her back and she need[s] to position change every five minutes approximately.  Standing:  Her back hurts if she does it for prolonged periods.  The key to her success is position change and stretching.  Walking gives her pain in her back, heels, knees and hips.  Bending gives her pain in her knees and hips.  Stooping:  She cannot do that at all, secondary to pain in her hips and knees.  Lifting with her arms:  Briefly she can do that fairly unrestricted.  Grasping:  MCP joints of her hand give her some pain and problems at times.

Tr. at 248-49.  Dr. Schultz also described Meier's cognitive and psychological capabilities:

> She does have underlying depression, but I think she is able to speak very well with others.  She can concentrate fairly well at times.  She has some concerns that she is an airhead and not able to keep thoughts straight, but she has worked out a system of a notebook in her purse that allows her to keep doing this.  She is taking

_____

vomiting, constipation, dry mouth, anorexia, diarrhea, dypepsia, flatulence, somnolence, insomnia, confusion, asthenia, dizziness, nervousness, hallucinations, anxiety, depression, euphoria, tremor, abnormal coordination, speech disorder, abnormal thinking, abnormal gait, abnormal dreams, agitation, parasthesia, amnesia, syncope, paranoia, dyspnea, hyperventilation, apnea, hemoptysis, pharyngitis, hiccups, bronchitis, rhinitis, sinusitis, upper respiratory tract infections, sweating, pruritus, rashes, and application site reactions, including erythema, papules, itching, and edema.  *Id.* at p. 22.

[6]  For pain and seizures.

[7]  Percocet is a combination of oxycodone and acetaminophen for relief of moderate to severe pain.  *See* www.rxlist.com/cgi/generic/oxypap_ids.html.  It is a schedule II opiate whose side effects include respiratory depression, apnea, respiratory arrest, circulatory depression, hypotension, shock, dizziness, drowsiness, nausea, vomiting, dysphoria, constipation, malaise, fatigue, headache, tachycardia, dysrhythmia, stupor, parasthesia, anxiety, mental impairment, agitation, confusion, myalgia, somnolence, depression, and dyspnea.  *Id.*

[8]  For depression.  The FDA has discontinued use of its active ingredient, nefazodone hydrochoride.  *See*  www.rxlist.com/cgi/generic/nefaz.htm.

[9]  For the symptoms of osteoarthritis and acute pain.  The FDA discontinued use of this drug in September 2004.  *See* www.rxlist.com/cgi/generic/refecox.htm.

> Serzone for depression. . . . Thinking clearly and relating, she does well.  And follow instructions she does very well, unless it is complicated, where she writes them down.

Tr. at 249.

Lokendra B. Sahgal, M.D., examined Meier at the request of the Bureau on December 22, 2003.  Tr. at 250-57.  Meier cried through most of the examination and could not explain why she was upset.  Meier told Dr. Sahgal that she had hypertension, mitral valve prolapse, status post appendectomy, depression, status post right knee surgery, fibromyalgia, osteoarthritis, chronic constipation, acid reflux, sleep apnea, tempromandibular joint problems, and chronic fatigue syndrome.  She alleged constant headaches and neck pain, joint pain, difficulty walking due to pain, fatigue, difficulty standing for long, difficulty sleeping, and poor memory.  Meier's medications included a Duragesic patch, Serzone, Metoclopramide,[10] Diovan, Vioxx, Atenolol, Oxycodone, Lasix,[11] and Neurontin.  Dr. Sahgal recorded the following impressions of his examination:

> The claimant had no difficulty maneuvering in the examining room or getting on and off the examination table.  . . .  Her height was 5' 2½".  Weight 240 pounds.  Blood pressure was 108/70.  Pulse was 60, regular.  Respirations were 20.  Head, eyes, ears, nose and throat were grossly normal.  Pupils were equal and reacting to light and accommodation.  Sclerae is nonicterus.  No nystagmus.  Funduscopic examination was grossly normal.  Vision was 20/30 right eye, 20/30 left eye, and 20/25 both eyes with corrective lenses.  Ear canals were normal.  Tympanic membranes were normal.  Hearing was grossly normal.  Nose, throat, teeth, and gums were normal.  Neck is supple.  Trachea central.  Thyroid normal.  No masses palpable in the neck.  No jugular venous distention.  No carotid bruits.  Chest symmetrical and expands equally on both sides.  Lungs clinically clear to percussion and auscultation.  There were tender spots in the intrascapular system:  S1, S2 normal, no murmur, no gallop.  Abdomen is soft.  Liver and spleen not palpable.  No masses palpable in the abdomen.  Bowel sounds were normal.  No hernias felt.

---

[10]  For acid reflux.

[11]  For fluid retention.

6

There was a midline scar in the abdomen, probably from previous surgery.  Liver, spleen, and kidney were not palpable.  All the joints were grossly normal.  There was no swelling, redness, or deformity.  There were definite trigger points in the back and in the bilateral sacroiliac joints and intrascapular area.  Neurological examination was grossly normal.  No motor or sensory loss.  Deep tendon reflexes were 2+ and equal bilaterally.  Romberg sign was negative.  Cranial nerves II-XII are normal.  The patient has good peripheral pulses, 2/4 in both lower extremities.  The manual muscle strength testing was done.  Both upper and lower extremities muscle strength was normal, 5/5 against maximum resistance.  The claimant was right hand dominant.  The Dynamomater reading:  The first reading with the right hand was 25 pounds.  The left hand was 20 pounds.  The second reading with the right hand was 20 pounds.  The left hand was 15 pounds.  The grasps, manipulation, pinch, and fine coordination in both hans was normal.  The muscle testing was fairly reliable even though the patient was upset and crying.  There were no muscle spasms.  No abnormal reflexes.  No muscle atrophy.  She was able to hold things right and dress and undress without assistance.  The range of motion of the cervical spine was normal.  Both shoulders, both wrists, and both elbows, both active and passive range of motion, were normal.  All the small joints in both hands had normal range of motion.  She had complained of some pain in her distal interphalangeal joint and proximal interphalangeal joints of both hands.  The dorsolumbar spine range of motion was also grossly normal but she complained of a lot of pain with forward flexion and side-to-side bending.  Both hips, both knees, and both ankles['] range of motion was grossly normal.

Tr. at 251-52.  Dr. Sahgal's assessment of Meier's ability to do work was as follows:

Sharon Meier's ability to do lifting or carrying is somewhat impaired due to her back pain and fibromyalgia and joint pains.  The claimant has no difficulty with tasks requiring walking or handling objects.  The claimant had no difficulty with speech or hearing. Her mental acuity was grossly normal and she was able to remember most of the things when detailing questioning but she claims that she has a loss of memory.  Sharon's ability to climb, balance, stoop, crouch, kneel, or crawl was not limited.  She was able to walk without any assistance.  She was able to bend and squat, walk on heels and toes without any difficulty.  The grasp in both hands was grossly diminished, but again I do not know if she put in her full effort as she was upset and crying.  Her grip was grossly normal in both hands.  Clinically there is no impairment with respect to sitting, walking, handling objects, hearing, speaking, or traveling.  She may have some difficulty or impairment for lifting or carrying due to her fibromyalgia and arthritis.

Tr. at 252.  An x-ray accompanying Dr. Sahgal's report showed hypertrophic changes

consisting of osteophyte formation along the lateral joint margin and at the superior and

inferior margins of the patella.

7

Joseph F. James, Ph.D., gave Meier a psychological evaluation on February 17, 2004 at the request of the Bureau.  Tr. at 258-63.  The evaluation included administering the Wechsler Adult Intelligence Scale-III ("WAIS-III"), the Wechsler Memory Scale-III ("WMS-III"), and the Wechsler Individual Achievement Test-II (Reading) ("WIAT-II").  Dr. James noted a past medical history that included an appendectomy, a broken leg, surgery on both feet for bone spurs and current treatment for osteoarthritis, acid reflux, mitral valve prolapse, temporomandibular joint syndrome, fibromyalgia, sleep apnea, sensitivity to bright light, and mood swings with depression.  Her then-current medicines included Aciphex, Neurontin, Furosemide,[12] Metoclopramide, Serzone, Oxycodone, Vioxx, Atenolol, Diovan, a Duragesic patch, and Wellbutrin.[13]

Dr. James found Meier's mental status to be normal in all respects, although Meier was somewhat tearful and anxious when discussing her brother's death eight years earlier. She appeared to be attentive and engaged in taking the tests and to be exerting good effort.  Meier had a verbal IQ on the WAIS-III of 88, a performance IQ of 109, and a full scale IQ of 97.  Her memory scores on the WMS-III were below expected levels given her scores on the WAIS-III.  She was borderline or below in auditory immediate memory, visual immediate memory, immediate memory, auditory delayed memory, visual delayed memory, and general memory.  Her working memory and auditory recognition delayed memory were in the average range.  Meier's reading ability was at the 10th grade level.

On the basis of his examination, Dr. James found Meier's ability to relate to others,

---

[12]  For water retention.

[13]  For depression.

including fellow workers and supervisors, to be mildly impaired due to mood swings and pain management and her ability to withstand the stress and pressures associated with day-to-day work activity to be moderately impaired based upon depressed moods and pain. He diagnosed Meier as suffering from a mood disorder, a major depressive disorder, and, in conjunction with her physical ailments and life circumstances, assigned her a Global Assessment of Functioning ("GAF") of 60.[14]

On March 3, 2004, Karen Steiger, Ph.D., a state agency psychologist, reviewed Meier's record and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique.  Tr. at 287-302.  Dr. Steiger diagnosed Meier as suffering from a recurrent major depressive disorder resulting in mild restrictions of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Steiger also opined that Meier was moderately limited in her ability to understand and remember detailed instructions, moderately limited in her ability to carry out detailed instructions, moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but was not otherwise limited.  Dr. Steiger referred to Dr. James' evaluation of Meier in making her assessment, found her statements regarding her limitations to be credible, and asserted that Meier would be limited to simple, repetitive tasks in a work setting free of strict production quotas.  Roger O. Lewis, Jr., Ph.D., affirmed Dr. Steiger's

---

[14]  A GAF of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

9

assessments on July 7, 2004.

Robert E. Norris, M.D., completed a residual functional capacity assessment of Meier on March 5, 2004.  Tr. at 303-07.  He opined that Meier could occasionally lift 100 pounds or more, frequently lift 50 pounds or more; stand or walk about six hours in an average workday; sit for six hours in an average workday, was unlimited in her ability to push or pull; and had no postural, manipulative, visual, communicative, or environmental limitations.  In explaining his divergence from the opinions of Meier's treating physician, Dr. Norris wrote, "The attending physician wrote that the claimant could not bend at all.  At the consultative examination, the claimant had an unrestricted ability to bend."  Tr. at 307.  His opinion was affirmed on July 8, 2004.

Meier called Dr. Schultz on May 1, 2004 and reported that the Duragesic patch had been recalled by the manufacturer.  Tr. at 363.  Dr. Schultz wrote a prescription for Oramorph SR.[15]  On May 3, 2004, Meier appeared to be in pain.  Meier and Dr. Schultz discussed weaning her off Serzone.

On May 10, 2004, Dr. Schultz responded to questions posed by the Bureau regarding Meier's medical condition.  Tr. at 264-65.  Dr. Schultz wrote that Meier experienced pain everywhere except in her head, but that the pain was more prominent in her back, legs, thighs, and elbows.  These symptoms were supported by such clinical findings as many pressure points over her back, pain responses in increased pulse up and down her ILS muscles, expressions of anxiety and depression, and quadriceps and

---

[15]  Oramorph SR is an oral form of morphine.  The manufacturer, Merck & Co., Inc., recommends its morphine products for acute and chronic pain.  *See* www.merck.com/mmhe/sec06/ch078/ch078d.html.

10

hamstrings tender to palpation.   He listed her then-current medications as Aciphex, Atenolol, Diovan, a Duragesic patch, Risperdal,[16] Lasix, Neurontin, Percocet, and Serzone. He noted that he was going to try to wean Meier from some medications beginning in March, but he also noted that her response to therapy was poor.  In summarizing Meier's condition, Dr. Schultz wrote as follows:

> Her overall symptoms are severely limiting to her.  She has severe pain.  She is unable to walk/move.  Even setting her elbows on the table caused severe pain for her where she cried.  There is a tremendous amount of psychiatric involvement in this diagnoses, but the diagnosis still stands as fibromyalgia with depression on top of this.  At this point, the depression is getting the best of her.  She can stand, walk, bend, stoop, lift, and grasp, but it is extremely painful for her, and the pain persists for days afterwards.  As an example, she stated she bent over and cleaned her carpet two days ago, and she was still feeling extreme pain in her back and legs from this, as well as her arms.
>
> Her ability to concentrate is severely limited.  She is not thinking very clearly.  Her communication skills are poor; her husband is relating this to me.  When she is trying to think up words, she just can't get them out.  She is also bottling up to him and not being open with him, which is new.  She needs a lot of reminding from her family to complete everyday tasks.  She has no impairment in hearing or seeing. Memory is poor.  Her adaptive skills at this time are very poor.  Her GAF rating would be approximately 20-30 at the present time.

Tr. at 265.

Meier's depression was better on May 11, 2004 during her visit to Dr. Schultz.  Tr. at 364-65.  Her pain from fibromylagia and arthritis were about the same, however.  Dr. Schultz found trigger points along the spine, predominately at the T10 to L1 region, and in the quadriceps and hamstrings.  There was no SI joint tenderness, but there were marked crepitations bilaterally.  Her weight was 234 pounds.

---

[16]  For bipolar I disorder.  Side effects include dystonia, akathesia,  somnolence, manic reaction, anxiety, pain, fatigue, myalgia, skeletal pain, hypertension, tachycardia, abdominal pain, constipation, and confusion.  *See* www.rxlist.com/cgi/generic/risperid.htm.

Dr. Seese examined Meier on May 28, 2004.  Tr. at 267.  Meier reported some fluttering and palpitations.  Examination revealed a regular heart rate with a short systolic murmur, mild pretibial edema, and peripheral pulses 1+/4+ bilaterally.  Dr. Seese diagnosed palpitations, mitral regurgitation, and sleep apnea.

A visit with Dr. Schultz on June 3, 2004 found Meier's various conditions stable, with some flaring of her fibromyalgia.  Tr. at 360-62.  Dr. Schultz found trigger points all over her back and down her hips, positive SI joint tenderness, and crepitations in her knees and hips.

An echocardiogram conducted on June 9, 2004 revealed a minimal mitral valve prolapse with minimal mitral regurgitation, mild tricuspid regurgitation, and left atrial enlargement.  Tr. at 266.

On June 23, 2004 Curt S. Ickes, Ph.D., examined Meier at the request of the Bureau.  Tr. at 283-86.  Meier's  report to Dr. Ickes included the following:

> [S]he has been suffering recurring symptoms of depression since 1995, following the death of her brother.  According to the claimant she experiences the following symptoms on a daily basis, sadness, crying spells, poor memory and concentration, low energy level, and a loss of appetite.  She occasionally will have fleeting suicidal ideation and feeling of withdrawal.  Sharon began taking antidepressants approximately nine years ago, and her medication was recently switched to Zoloft.  She feels that this change has been beneficial saying, "I used to didn't want to go any where or see anyone and now it is better.  Everything is still there but it's better than what it was."

Tr. at 283.  Meier also reported a family history of anxiety and said that she was in constant pain.

Dr. Ickes found Meier to be physically normal except for her weight and an unusually slow gait.  Her mental status was normal except for a depressed affect and tearfulness when talking about her dead brother and her health.  Meier reported that her depression

12

came in episodes then disappeared. Her current depressed episode had begun in February. Cognitive function was normal, including adequate memory. Meier described her daily activities as follows:

> During the day she will attempt to do housework but states that she can only work for an hour at a time due to chronic pain. She will then take short breaks before trying to tackle more tasks. Other daily activities include watching television, cooking, and spending time on the computer. Again, she is unable to spend much time on the computer due to her health conditions. She does do grocery shopping but is unable to carry out her groceries. She said, "My friend told me to go to Aldi's, but I can't go because you have to pack your own groceries. I have to go where there is a carry out and then when I get home someone brings them in from the car."

Tr. at 285. Dr. Ickes assigned Meier a GAF of 55 and diagnosed her as suffering from a moderate and recurrent major depressive disorder, various physical ailments, and psychosocial stressors of health concerns and grief over her bother's death eight years earlier. He found that, due to depression, Meier's ability to relate well with others, including fellow workers and supervisors, was moderately impaired; her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks would likely be moderately impaired; and her ability to withstand the stress and pressures associated with day-to-day work activities would be moderately impaired.

Dr. Schultz examined Meier on July 1, 2004. Tr. at 357-59. Meier reported that her gastrointestinal reflux was better but her depression was worse. Her arthritis was improving as the weather warmed. Meier's pain was worse on August 2, 2004, and she reported limitations in her activities of daily living as a result. Tr, at 355-56. Her depression had also worsened, and she said that she did not want to get out of bed. Dr. Schultz wrote:

> She does not want to exercise and she rarely if ever does. I told her this is how fibromylagia is treated and she can't bring herself to get up and do it. She is extremely fatigued as well. It hurts anytime she does anything including moving, just sitting here in the office hurts her. She got bad news from social security, she was

13

denied.  This flared her depression.

Tr. at 355-56.  Dr. Schultz found many trigger points up and down the ILS muscles, worse on the left than on the right.  There were no problems with Meier's range of motion.

On August 30, 2004, Meier reported to Dr. Schultz that pain was constant except when lying still.  Tr. at 352-54.  She reported pain when she walks and that she was unable to do dishes because of the pain.  She also reported that she had reduced the amount of Percocet she was taking and had increased the morphine.  Dr. Schultz found trigger points on her back and hips and positive crepitation in the knees, although Meier's did not report her knees as hurting.   Her depression was worse, and Dr. Schultz recommended counseling.

Between September 2004 and April 2005 Meier received psychological counseling from Leon Howard, Ph.D., at the Counseling Center of Wayne and Holmes Counties ("Center").  Tr. at 308-35.  Meier's final self-report of her sessions indicated no progress toward her goal of decreasing her feelings of depression.  In closing its file on Meier, the Center noted that she had been counseled to manage her feelings of depression by engaging in activities that interested her. Tr. at 300-402.  The Center also noted, however, that she had difficulty managing the pain she was experiencing.

Meier visited Dr. Schultz on September 27, 2004.  Tr. at 350.  She told Dr. Schultz that she was having problems affording her medication and expressed a desire to cut back on her morphine and eventually see if she could do without it.  Dr. Schultz found her to be "weepy."  He detected trigger points up and down her spine and into her hips.  On October 4, 2004, Meier reported that she had stopped using Vioxx and that her joints hurt.  She also reported that she had been active that weekend.  On November 1, 2004, Dr. Schultz found

14

that Meier was doing fairly well on the reduced dosage of morphine, but he found trigger points up and down the spine and into the hips bilaterally.

When Meier's visited Dr. Schultz on December 6, 2004, she had discontinued morphine for almost a month and reported doing well.  Tr. at 345.  She was using one Percocet to help deal with pain and found that it helped tremendously, although she still reported pain, particularly in the hips and low back.  Dr. Schultz found point tenderness up and down her spine.  Meier's blood pressure was 110/60, and her weight was 248 pounds.

Dr. Schultz examined Meier on January 25, 2005.  Tr. at 342.  Meier reported pain in her knees, hips, and upper and lower back, and Dr. Schultz found positive trigger points in the upper back into the shoulders and crepitation in the knees and hips.  Meier reported using Percocet three times a day.  She also admitted that she was not exercising.  Dr. Schultz stressed the importance of exercise in dealing with fibromyalgia and arthritis. Meier's blood pressure was 120/70, and her weight was 254 pounds.

Dr. Schultz examined Meier on April 5, 2005.  Tr. at 340.  Dr. Schultz recording the following notes after Meier's visit:

> Patient presents for recheck. She is running out of her Neurontin and a couple other medications. We have no samples to give her. She states she has no money to buy them. I don't know what to tell her. She has not applied for the programs from the companies. I told her she needs to take some ownership on what she is going to do and what she is not going to do. Asked about her exercise. She states she is walking maybe once a week. Told her that is not enough. It needs to be 20-30 minutes a day. If she is not going to do this, nothing is going to work. She needs to take the weight off, needs to get her muscles back in shape. That is what the hallmarks of treatment for fibromyalgia and osteoarthritis are based on. I have been telling her this for years. She has relied on medication in the past, but she can't afford it. If we have samples, we are more than happy to give them to her. But we cannot manufacture samples. She could probably qualify for reduced cost drug programs, but she has not taken the time to actually fill out the forms and apply for them. Asked her about her depression. She states that is not the issue. I don't know what the issue is. She has maxed out on Zoloft. She is on Risperdal 1/2 mg

15

daily.

Tr. at 340.  Dr. Schultz noted that Meier was not depressed at that time.  He diagnosed osteoarthritis, myositis, and fibromyalgia and prescribed Doxepin.[17]  He decreased Zoloft due to Meier's financial problems and recommended that she use the free clinic, as it had a more substantial supply of free medications.

Meier visited Dr. Schultz on May 5, 2005.  Tr. at 338.  Meier complained of particularly acute pain in her arms, although her low back and hips were better.  Meier reported that she could barely get around and do household tasks without pain.  She also reported that she was trying to exercise and walk daily.  Dr. Schultz found trigger points up and down her spine, especially into the shoulders.  He diagnosed osteoarthritis, fibromylagia, and myositis, prescribed Percocet, and recommended exercise.  Meier's blood pressure was 124/70 and her weight 263 pounds.

On September 13, 2005, Meier reported that she had worked in her garden and taken an hour walk with her grandchild until she could not walk any further.  Tr. at 395-97.  Now, according to Meier, almost her entire body hurt.  Dr. Schultz found trigger points up and down her spine, but there was no joint or leg swelling.  He also recommended that she stop taking Risperdal because of financial problems.

Dr. Schultz completed a Medical Source Statement:  Patient's Mental Capacity form for the Bureau on September 22, 2005.  Tr. at 368-69.  Dr.  Schultz opined that Meier had no limitations on the basis of her mental capacity.  On the same day, he also completed a Medical Source Statement:  Patient's Physical Capacity form for the Bureau.  Tr. at 370-71.

---

[17]  For depression.

Dr. Schultz wrote that Meier was limited in her lifting and carrying because of pain, but he was unsure how much she could lift.  He also asserted that Meier could not stand or walk for more than one hour without interruptions, although he believed that there were no other limitations if she alternated standing or walking with other postures.  Similarly, he wrote that Meier could not sit for more than one hour without interruptions but that there were no other limitations if she alternated sitting with other postures.  He also indicated that Meier did not need to lie down at some point during the day.  He further opined that Meier should rarely or ever crawl and only occasionally climb, crouch, or kneel.  He found that Meier did not suffer from any other physical limitations.

Meier telephoned Dr. Schultz on October 1, 2005 to report that another doctor had started her on Topamax and that she had suffered a lot of pain over the weekend.  Tr. at 389.  She had begun taking extra Percocet for the pain.  Dr. Schultz advised to to stop taking the Topamax but that she could use extra Percocet to handle the pain.

Meier called again on October 4, 2005 to report that she had been experiencing side effects after taking Cymbalta[18] for three weeks.  Tr. at 393.  Dr. Schultz advised her to stop taking Cymbalta.  On October 11, 2005 she reported that felt better after she stopped taking the drug.  Tr. at 390-92.  She was outside at a turkey roast all weekend, and joint pain was fair afterward.  Meier's blood pressure was 118/78 and her weight was 268 pounds.

Meier saw Dr. Schultz on November 7, 2005 and reported that the pain in her hands was worse.  Tr. at 385-87.  Dr. Schultz wrote in his clinical notes as follows:

---

[18]  For major depressive disorder.

17

> She has very low motivation.  She doesn't get out of bed.  Likes to lay around.
> States that, when she moves, it hurts.  Talked about how exercise is one of the only
> true things that helps and that she needs to do more.  She is in agreement but is just
> lacking in motivation.  She is currently trying to knit a scarf for her husband.  She is
> going to cross stitch question marks onto it.  States that, in the morning when she
> wakes up, she is in incredible pain from this.  Discussed trying to get blood work
> done, looking again to see if there is a rheumatologic cause.  States she can't afford
> it and will consider it if she ever gets insurance.

Tr. at 286.

On April 10, 2006 Meier had to stop taking Lyrica,[19] a prescribed medication that she had used successfully since February 2006 to control pain, because she could not afford it.  Tr. at 377-78, 381-83.  She increased her dosage of oxycodone to compensate.  Dr. Schultz found her to be very emotional.  He also found positive myalgias and trigger points all along her spine and into her hips.  He promised to try to get some samples of Lyrica for Meier to use.  When they arrived and Meier took them, they worked very well.  Tr. at 379-80.

Meier had an allergic reaction to Metronidazole in July 2006, and she was switched to another medication.  Tr. at 372.  She complained of joint pain, but it was not as bad as usual.

On October 26, 2006, Jeffrey D. Madden, Ph.D., a psychologist, completed a Medical Expert Testimony form in conjunction with his testimony at Meier's hearing.  Tr. at 406-07.  He opined that Meier's mental condition imposed no limitations on her activities of daily living of social functioning but did impose mild limitations on her concentration, persistence, and pace.  Dr. Madden also opined that Meier could understand and follow complex instructions; adequately maintain attention and concentration in performing such

---

[19]  For control of pain associated with fibromyalgia.

18

tasks; adequately maintain acceptable social behavior; relate satisfactorily with supervisors, co-workers, and the public; perform work requiring high levels of interpersonal interaction, high quotas, or heavy production; comply with time and attendance requirements; adapt and respond appropriately to changes in the workplace; and exercise acceptable judgment concerning work functions and scheduling.

*C.    Hearing testimony*

Meier testified at the hearing that she had worked as a dietary manager at a hospital cafeteria from 1979 to 1995, followed by kitchen jobs at the College of Wooster and Bob Evans.  Tr. at 413-16.  She said that she stopped working at Bob Evans because she was in too much pain and her doctor told her to stop.

The ALJ asked a series of questions to determine what Meier could and could not physically accomplish.  He began with questions about Meier's ability to use her hands:

Q    All right.  Now you've got a number of things that are in the record that are impairments that are keeping you from working.  Joint pain, you've got osteoarthritis  in which hand?

A    Both.

Q    Both?

A    Uh-huh.

Q    What does that keep you from doing?

A    Lifting, it's very hard for me to write very long with a pen or pencil. Play cards, anything holding things in my hands for very long causes pain.

Q    Do you play cards?

A    I try to sometimes.  It's hard. . . .

Q    Can you, do you shuffle the cards?

19

A       Not real well, no.  Not any more.

Q       How about dealing them?  If it's your turn to deal?

A       Yeah, that's really hard.  Yeah.  I don't play cards very often.

Tr. at 416-17.  According to Meier, she sometimes drops items.  Tr. at 427.  Meier also

testified that she had joint pain all over her body, not just in her hands, due to fibromyalgia.

Tr. at 417.  She denied that her heart was causing her any problems at that time because

the medication kept her mitral valve prolapse under control.  Tr. at 417-18.  She asserted,

however, that she was constantly fatigued and that fatigue and joint pain required her to

lie down after working or walking for a half hour to an hour.  Tr. at 418-19, 425-26.  Meier

told the court that some tasks, such as vacuuming, could be physically accomplished, but

they would cause her a considerable amount of pain.  Tr. at 418-19.

The ALJ also questioned Meier about her sleep apnea:

Q       You have sleep apnea?

A       Yes.

Q       How is the C-pap working for you?

A       Well, I haven't been wearing it because I lost my insurance, so I can't
afford to have it adjusted and it doesn't fit me quite right now.  So I don't wear it.  I
did feel better though when I wore it.

Q       What is it that needs adjusting?

A       The mask on my face, and I'm not sure that, I've lost some weight
since then so I'm not sure that the amount of pressure is correct.

Q       Have you been back to the sleep doctor?

A       No.

Tr. at 419-20.  Meier denied seeing any doctor other than Dr. Schultz because she could

20

not afford another doctor.  Tr. at 421.

Meier testified that when she took her medications, her pain was about a five on a ten-point scale.  Tr. at 422.  When she exerted herself, however, the resulting pain would be above five.  Tr. at 430.  She admitted that she had been told to exercise but did not.  According to Meier, she did not exercise because it hurt to do so.  Tr. at 422-23.  She did not think that her memory problems were very severe.  Tr. at 423.

Meier told the court that she had not had psychological counseling since April 2005.  According to Meier, she stopped because she did not believe that the counseling was helping her.  She also asserted that she had stopped wearing knee and ankle braces because she "can't stand to be constricted.  It hurts me to just stay in one position for more than a few minutes."  Tr. at 431.

The ALJ questioned the ME, a psychologist, about Meier's mental limitations.  The ME testified that Meier would have mild difficulties with concentration, persistence, and pace due to depression but otherwise had no mental limitations.  Tr. at 433-34.

The ALJ asked the VE to assume a hypothetical person who could lift 20 pounds occasionally and ten pounds frequently, who could sit for an hour at a time, stand for an hour at a time, could sit or stand for six hours out of eight, could walk for a half hour for four of eight hours, could crouch occasionally, could not crawl, could occasionally kneel, could occasionally use the stairs, and could not work in high places or around moving equipment.  The ALJ then asked if such a person could perform Meier's past relevant work.  The VE testified that such a person could not.  When asked, the VE also testified that none of Meier's work-related skills were transferable to any job with a lower exertional level.

The ALJ then asked the VE if a person with the functional capacity already described

21

and having claimant's age, education, and work experience could perform any other full time work in the national economy.  The VE testified that such a person could perform certain unskilled jobs, including file clerk, general office clerk, and order clerk.  According to the VE, these jobs were performed at the light exertional level.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her

22

past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since August 15, 2003, the alleged onset date.

3.  The claimant has the following severe impairments:  joint pain/fibromyalgia, chronic fatigue, osteoarthritis-hands, sleep apnea, mood disorder (secondary to medical condition) and obesity. . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the exertional demands of light work.  The claimant can sit for 1 hour at a time and 6 hours per 8 hour day; stand for 1 hour at a time and 6 hours per 8 hour day; walk 30 minutes at a time and 4 hours per 8 hour day.  The claimant should avoid high work (scaffolds and ladders) and never crawl.  She can occasionally crouch, climb stairs, and kneel.  The claimant can perform simple and repetitive work, no complex tasks, and no working with equipment. . . .

6.  The claimant is unable to perform any past relevant work. . . .

7.  The claimant was born on April 20, 1956 and is 50 years old, which is defined as an individual closely approaching advanced age.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

23

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 15, 2003 through the date of this decision.

Tr. at 16-24 (citations omitted).

In discounting the opinions of Dr. Schultz that Meier's symptoms were severely limiting, the ALJ wrote as follows:

This statement contradicts his records and the whole medical record. He stated later on that the claimant was not compliant with his recommendations and unless she follow [sic] his treatment advice her pain would not get any better. Therefore, the undersigned has not afforded Dr. Schultz's opinions controlling weight because his opinions are inconsistent and are not well supported by the record as a whole or by his records specifically.

Tr. at 22.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

24

VI. Analysis

Meier alleges that the ALJ erred by (1) failing to give appropriate weight to the opinion of Meier's treating physician and (2) concluding that Meier is not disabled by pain.

A.      *Whether the ALJ erred in not giving proper weight to the opinion of Meier's treating physician*

Meier contends that the ALJ erroneously failed to accord controlling weight to Dr. Schultz's opinion. The Commissioner denies that Dr. Schultz's opinion was due controlling weight.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman*

25

*v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

The ALJ's explanation regarding why Dr. Schulz's opinion was not given controlling weight is unsatisfactory.  First, the ALJ fails to explain precisely how Dr. Schultz's opinion is contradicted by "the whole medical record."  Tr. at 22.  Apparently, it is because the results of Meier's musculoskeletal and neurological examination with Dr. Sahgal were normal; she was able to get on and off an examination table without assistance; her gait is unremarkable; and she was able to bend, squat, and walk on heels and toes.

These considerations, however, are irrelevant in weighing allegations of disabling pain due to fibromyalgia:

[F]ibromyalgia[FN3] can be a severe impairment and . . . , unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs.  *See Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia); *see also Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain").  Rather, fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion."  *Preston*, 854 F.2d at 820.  The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials.  *Id.*; *Swain*, 297 F. Supp. 2d at 990.

FN3. Fibromyalgia, also referred to as fibrositis, is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues."  *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition.  *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (noting that "a growing number of courts ... have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can

conclusively confirm the disease") (internal quotation marks and citations omitted); *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir.2004) (" 'Because proving the disease is difficult . . ., fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.' ") *(quoting Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

*Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007). Dr. Schultz has tested Meier for "trigger points," *i.e.*, sites of unusual tenderness, on nearly every occasion that he examined her. On every occasion, Meier was positive for trigger points.[20] Dr. Schultz ordered x-rays, recommended psychological counseling, prescribed physical therapy, prescribed medications for rheumatism, and prescribed exercise. Also, in the expressed belief that Meier's fibromylagia and depression are related, he has tried various medications for simple depression, major depressive disorder, and bipolar I disorder. In short, Dr. Schultz has done precisely what ought to be done when dealing with what is suspected to be fibromyalgia. His diagnosis is *not* contradicted by the whole medical record.

Second, although the ALJ asserts that Dr. Schultz contradicts himself with respect to Meier's capabilities, it is plain from reading Dr. Schultz's notes that Meier's fibromyalgia "flares," improving at times and worsening at other times. It is unsurprising, therefore, that at times Dr. Schultz describes Meier's capacities as very limited and, at other times, describes them as moderately limited. Thus, Dr. Schultz's opinion on May 10, 2004 that Meier's symptoms are severely limiting and that her GAF would be approximately 20-30 was followed by the limiting expression, "at the present time." Tr. at 265; *see also* tr. at 360-62 (noting a worsening of Meier's pain); *compare also* tr. at 357-59 (noting an

---

[20]   Dr. Sahgal's examination confirmed Dr. Schultz's findings of trigger points and other sensitive areas along Meier's spine.

27

improvement in Meier's pain with warm weather) with tr. at 355-56 (noting a subsequent worsening of Meier's pain).  Dr. Schultz's most recent assessment of Meier's physical capacities was far less limiting than was his May 10, 2004 assessment.  *See* Medical Source Statement: Patient's Physical Capacity, completed September 22, 2005, tr. at 370-71.  This does not mean that Dr. Schulz is inconsistent.  Rather, it means that the extent of Meier's pain varies.

Third, the ALJ asserts that Dr. Schultz's opinion is not afforded controlling weight because Meier is not compliant with Dr. Schultz's advice that she exercise.  Meier's failure to comply with recommended treatment may, indeed, be a valid reason not to award benefits, but it is impossible to see how Meier's failure to comply with Dr. Schultz's advice is a reason for concluding that Dr. Schultz's opinions are not credible.  Dr. Schultz has described Meier's capacities as fairly limited; he has also openly declared that this may be the result of her failure to exercise as he has advised.  How this supports a conclusion that Dr. Schultz's opinions should not be given controlling weight is unclear.

The ALJ has not articulated a satisfactory reason for not according the opinion of Dr. Schulz controlling weight.  For this reason, it cannot be said that his failure to accord Dr. Schultz's opinion controlling weight is supported by substantial evidence.

B.      *Whether the ALJ erred in concluding that Meier is not disabled by pain*

Meier contends that the ALJ  erred in concluding that she was not disabled by pain.  The Commissioner denies that the ALJ erred.

The Sixth Circuit in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994), most clearly stated the test which courts must use in reviewing the Commissioner's determinations of the credibility of an applicant's statements about pain and disability.  The Court reviewed

the pertinent regulations at 20 C.F.R. § 404.1529 and summarized the applicable test as follows:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition;  or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 1038-39 (quoting *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  The Court specifically noted that the second part of this test is satisfied if the plaintiff satisfies either alternative after finding objective evidence of an underlying medical condition.  Thus, the test "does not require . . . 'objective evidence of the pain itself.'"  *Felisky*, 35 F.3d at 39 (quoting Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984)) (footnote omitted).  The Court also summarized the factors that should be considered in determining whether the established medical condition can reasonably be expected to produced the alleged disabling pain:

> (i) Your daily activities . . .
> (ii) The location, duration, frequency, and intensity of your pain . . .
> (iii) Precipitating and aggravating factors . . .
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms . . .
> (v) Treatment, other than medication, you receive or have received for relief of your pain . . .
> (vi) Any measures you use or have used to relieve your pain . . .

*Felisky*, 35 F.3d at 1039-40.  The Court added that "the opinions and statements of the claimant's doctors" are also relevant to the Commissioner's and the reviewing court's determination.  *Id.* at 1040.

The ALJ found that Meier suffers from underlying medical conditions that might be expected to cause pain.  Thus, the remaining issue is whether objective medical evidence

29

confirms the severity of the pain Meier alleges from the condition or whether the conditions are of such a severity that they can reasonably be expected to produce the alleged disabling pain.

Meier argues that there is one piece of objective medical evidence that confirms the severity of her pain. According to Meier, "The record clearly shows that Dr. Schultz noted on physical exam an objective increase in plaintiff's heart rate with palpation of her trigger points (Tr. 264-265). This objective evidence should be sufficient to confirm the severity of the plaintiff's alleged pain symptoms." Plaintiff's Brief on the Merits, Doc. No. 16, p. 13 (punctuation altered). Meier provides no evidence that an increase in heart rate upon palpation of trigger points indicates the level of pain alleged by Meier. Thus, Meier has not provided objective evidence confirming the severity of the alleged pain.

The ALJ failed to perform the analysis using the factors recommended by the Sixth Circuit to determine whether Meier's medical condition's could reasonably be expected to cause the alleged pain. Instead, the ALJ determined that Meier's allegations regarding the intensity, persistence, and limiting effects of her symptoms were not credible for a variety of reasons. The following were the only reasons that might be related to Meier's allegations of pain:

> The claimant had a consultative examination by Dr. Sahgal and her musculoskeletal and neurological examinations were normal. She had multiple allegations of pain but she was able to get on and off the examination table, dress and undress with[out] any assistance, her gait is unremarkable. The claimant's treating physician, Dr. Schultz[,] recommended exercises for her firbromyalgia. The claimant was not complaint [sic] with this recommendation[,] and Dr. Schultz explained to the claimant that is how you treat fibromyalgia. The claimant alleges major problems with her hands but can deal cards. Dr. Sahgal noted that she was able to walk without any assistance. She was able to bend and squat, and walk on heels and toes without any difficulty. The grasp in both hands was grossly diminished, but again, the doctor did not know if she put in full effort as she was upset and crying.

30

> Her grip was grossly normal in both hands.  Clinically there is no impairment with respect to sitting, walking, handling objects, hearing[,] speaking[,] or traveling. . . . In terms of activities of daily living and social functioning, the claimant testified that she does a wide variety of activities but it takes her longer as a result of her fibromyalgia, osteoarthritis in her hand and fatigue.

Tr. at 21-22.

This analysis is deficient for two reasons.  First, it fails to consider many of the six factors required by the Sixth Circuit.  It dwells instead on factors related to muscle strength and range of motion, such as the ability to get on and off an examination table and walk normally, factors which are not relevant to fibromyalgia.  It only perfunctorily mentions Meier's activities of daily living, giving few specifics.  The ALJ says nothing about  (1) the location, duration, frequency, and intensity of Meier's pain; (2) precipitating and aggravating factors affecting her pain; (3) the type, dosage, effectiveness, and side effects of medications Meier takes or has taken to alleviate her pain; (4) treatment other than medication Meier received for relief of pain; and (5) any other measures Meier uses to relieve her pain.  Some of these omissions are noteworthy.  For example, Meier has taken a variety of powerful opiods and other pain relievers, some for chronic moderate to severe pain, and at least one for chronic and acute pain.  Their side effects include a variety of symptoms alleged by Meier.  Also, Meier attempted physical therapy for her pain, but her therapist determined that therapy provided no relief.  Dr. Schultz noted that Meier gets some relief from pain by changing position frequently.  The ALJ failed to consider any of these factors in reaching his decision that Meier was not disabled by pain.

Second, the ALJ sometimes "cherry picks" data rather than considering the entire record.  For example, the only activity of daily living the ALJ looked at with any particularity in examining Meier's credibility was presented in terms that misrepresent the data.  The

31

ALJ asserts that "claimant alleges major problems with her hands but can deal cards," ignoring the particulars of Meier's testimony that put this in a very different light:

> Q     Do you play cards?
>
> A     I try to sometimes.  It's hard. . . .
>
> Q     Can you, do you shuffle the cards?
>
> A     Not real well, no.  Not any more.
>
> Q     How about dealing them?  If it's your turn to deal?
>
> A     Yeah, that's really hard.  Yeah.  I don't play cards very often.

Tr. at 416-17.  The ALJ also noted that Dr. Sahgal found Meier's gait to be normal while ignoring Dr. Ickes' observation that Meier had an unusually slow gait.  Similarly, in discussing Meier's sleep apnea, he observed that Meier's apnea is under control when she wears her CPAP but that she is not compliant in wearing it.  This ignores Meier's testimony that the CPAP no longer fits and she has no money to refit it.  The ALJ is under an obligation to consider the *entire* record, not merely those portions of the record he finds congenial.

The ALJ's analysis of Meier's allegations of pain does not employ the factors recommended by the Sixth Circuit and does not consistently examine the entire record in assessing the credibility of Meier's allegations.  The ALJ's determination that Meier is not disabled by her alleged pain, therefore, is not supported by substantial evidence.

## VII.  Decision

For the reasons given above, the court vacates the decision of the Commissioner and remands the case for further proceedings.  Upon remand, the ALJ should (1) reconsider the weight to be accorded Dr. Schultz's medical opinions and (2) consider

Meier's allegations of pain employing the analysis set forth by the Sixth Circuit in *Felisky*. If the ALJ considers Meier's compliance with Dr. Schultz's recommendation that she exercise, a medical expert is required to determine the impact any non-compliance would have on Meier's condition and/or limitations.

   **IT IS SO ORDERED.**


                                    s/ Nancy A. Vecchiarelli
                                    U.S. Magistrate Judge

Date:  July 30, 2008